[No. 66809-9-I.   Division One.   May 14, 2012.]

CAROL SAUTER, *as Personal Representative, Appellant,* v. HOUSTON CASUALTY COMPANY, *Respondent.*

*Marco J. Magnano Jr.*, *Bradley W. Hoff*, and *Jason R. Donovan* (of *Foster Pepper PLLC*), for appellant.

*Patrick M. Paulich* (of *Thorsrud Cane & Paulich*) (*Aidan McCormack* and *Sarah Kutner* of *DLA Piper LLP*, of counsel), for respondent.

¶1 DWYER, J. — Where an insurance policy explicitly provides coverage for the personal liability of a corporate officer incurred for acts performed in his or her official capacity as such, the policy does not insure against losses incurred where the officer acts in his or her personal capacity. Moreover, a guaranty executed by a corporate officer that secures the indebtedness of the corporation is not executed in the officer's official capacity. Such a circumstance would result in the corporation itself guaranteeing its own indebtedness, thus negating the very purpose of the guaranty.

¶2 Here, Michael Sauter, the chief executive officer (CEO) and manager of S-J Management LLC, contends that he executed such a guaranty in his official capacity and,

hence, that the purported loss that he incurred related thereto was insured by a directors' and officers' liability policy issued to S-J Management by Houston Casualty Company. However, because Sauter executed the guaranty in his personal capacity, the policy provides no such coverage. Thus, the trial court did not err by ruling that the Houston Casualty policy does not provide coverage for Sauter's personal obligation pursuant to the guaranty. Accordingly, we affirm the trial court's summary judgment dismissal of Sauter's declaratory judgment action against Houston Casualty.

I

¶3 In March 2008, S-J Management LLC (SJM), a limited liability corporation engaged in rental property management, entered into a business loan agreement with The Commerce Bank of Washington, NA. Pursuant to that agreement, Commerce Bank extended a $3.5 million non-revolving line of credit to SJM. Michael Sauter, SJM's CEO and manager, signed the loan agreement and promissory note in his official capacity on behalf of SJM.

¶4 The loan agreement required SJM, prior to the disbursement of the loan proceeds, to furnish to Commerce Bank a guaranty of the loan executed by Sauter in favor of the lender. Accordingly, Sauter executed an agreement whereby he "guarantee[d] full and punctual payment and satisfaction" of SJM's indebtedness to Commerce Bank (the guaranty). Sauter signed the guaranty as "Michael J. Sauter." Seven deeds of trust on real property owned by Sauter and his wife, Carol Sauter, secured the guaranty.

¶5 SJM's line of credit matured on May 31, 2009, and SJM failed to pay its indebtedness to Commerce Bank. Commerce Bank thereafter demanded payment in full on Sauter's "personal guaranty of the Indebtedness" of SJM, totaling over $2.8 million.

¶6 Subsequently, Sauter demanded indemnification from SJM for the amount that he was obligated to pay to

Commerce Bank pursuant to the guaranty. Sauter asserted that he had "entered into the [guaranty] in [his] role as [SJM's] CEO and did so to ensure that [SJM] could obtain the line of credit with Commerce Bank." He further asserted that he had "acted in good faith and placed [his] personal properties at risk to ensure that [SJM] would have funds available for operations from the line of credit." SJM's members, of whom Sauter was one, unanimously agreed that SJM "shall indemnify Michael Sauter for the personal liability incurred by him in connection with [SJM's line of credit] with Commerce [Bank]." Unsurprisingly, however, SJM was unable to indemnify Sauter for the same reason that it had been unable to pay its indebtedness to Commerce Bank—it was insolvent.

¶7 Sauter failed to fulfill his obligation pursuant to the guaranty. Accordingly, Commerce Bank sent multiple notices of default to the Sauters, informing them that failure to cure the default of the guaranty obligation could result in the sale of six encumbered real properties.

¶8 Counsel for SJM thereafter tendered to Houston Casualty Company the demand on Sauter's guaranty obligation from Commerce Bank, Sauter's letter demanding indemnification from SJM, and the notices of default on the Sauters' personally-owned properties. On September 24, 2009, Houston Casualty informed SJM that coverage was unavailable for "the Commerce Bank matter" pursuant to the Diversified Business Organization Policy—a directors' and officers' (D&O) liability policy—under which Houston Casualty insured SJM and its members and officers.

## II

¶9 The Houston Casualty policy pursuant to which Sauter sought coverage contains multiple insuring agreements, one of which provides coverage for personal liability incurred by SJM's managers and members when acting in their official capacity on behalf of the company. This insur-

ing agreement, entitled "Coverage A," provides, "The Insurer shall pay on behalf of the Insured Persons Loss resulting from any Claim first made against the Insured Persons during the Policy Period for a Wrongful Act."

¶10 The policy provides the following definitions for the terms employed in the insuring agreement:

¶11 An "Insured Person" is any "natural person who was, is, or shall become a duly appointed or elected director, officer, general partner, manager, or equivalent executive of an Insured Organization."

¶12 "Loss means damages, settlements and Costs, Charges and Expenses[1] incurred by any of the Insured Persons under Insuring Agreement Coverage A . . . but shall not include . . . matters deemed uninsurable under the law pursuant to which this Policy shall be construed."

¶13 A "Claim" includes "any written demand for monetary damages or non-monetary relief against an Insured commenced by Insured's receipt of such demand."

¶14 "Wrongful Act," as relevant here, "means, as alleged in any Claim, any actual or alleged act, misstatement, error, omission, misleading statement, neglect, breach of duty or act by . . . any of the Insured Persons, while acting in their capacity as . . . such on behalf of the Insured Organization."

### III

¶15 Following Houston Casualty's denial of coverage, Sauter filed a complaint for declaratory relief and damages, asserting that the Houston Casualty policy "is properly construed as covering the claim asserted by Commerce Bank in its written demand upon Sauter." Sauter sought

[a] judgment declaring that the Houston Insurance is properly interpreted as providing full coverage for the cost of defending,

---

[1] "Costs, Charges and Expenses mean reasonable and necessary legal fees and expenses (including expert fees) and cost of attachment or similar bonds incurred by the Insureds in defense of any Claim."

settling, and/or paying any loss incurred by and/or judgment entered against Sauter as a result of the subject claim or resulting litigation, and that accordingly Houston is obligated to pay monetary damages equal to the full cost of defending, settling, and/or paying any loss incurred by and/or judgment entered against Sauter with respect to such claim or litigation.

¶16 On August 27, 2010, Sauter filed a motion for summary judgment, asserting that "Commerce's claim against Sauter is covered under Coverage A of the Houston Casualty Insurance." Houston Casualty thereafter filed a cross motion for summary judgment, seeking a determination that it "does not owe a coverage obligation to Michael Sauter under the Houston Casualty insurance contract." Houston Casualty contended that no coverage obligation existed because (1) no act by Sauter constituted a "Wrongful Act" pursuant to the policy and (2) Sauter suffered no "Loss" as defined by the policy.

¶17 On September 24, 2010, the trial court denied Sauter's motion for summary judgment and granted Houston Casualty's motion for summary judgment, concluding "that Houston Casualty does not owe a coverage obligation or a duty to indemnify Michael Sauter under Coverage A of the Houston Casualty policy at issue for the Commerce Bank claim against Sauter." The parties thereafter stipulated that the trial court's September 24 order resolved the only coverage issues in dispute in the action. Accordingly, on February 11, 2011, the trial court entered final judgment.

¶18 Sauter appeals.[2]

IV

¶19 Sauter contends that he was acting in his capacity as CEO and manager on behalf of SJM when he executed the guaranty and thereafter failed to fulfill his obligations

---

[2] Following his appeal from the trial court's summary judgment order, Sauter passed away. We thereafter granted a motion to substitute Sauter's estate as the appellant in this matter and to change the case caption accordingly.

pursuant to that guaranty. Thus, he asserts, his conduct meets the capacity requirement of a "Wrongful Act" pursuant to the Houston Casualty policy.[3] We disagree.

¶20 We review a summary judgment order de novo, performing the same inquiry as does the trial court. *Johnson v. Recreational Equip., Inc.*, 159 Wn. App. 939, 954, 247 P.3d 18, *review denied*, 172 Wn.2d 1007 (2011). Similarly, the interpretation of an insurance contract is a question of law reviewed de novo. *Bushnell v. Medico Ins. Co.*, 159 Wn. App. 874, 881, 246 P.3d 856, *review denied*, 172 Wn.2d 1005 (2011).

■ ¶21 "Insurance policies are construed as a whole and 'given a fair, reasonable, and sensible construction.'" *Polygon Nw. Co. v. Am. Nat'l Fire Ins. Co.*, 143 Wn. App. 753, 766, 189 P.3d 777 (2008) (quoting *Kitsap County v. Allstate Ins. Co.*, 136 Wn.2d 567, 575, 964 P.2d 1173 (1998)). "Courts determine coverage under the plain meaning of the policy." *Bushnell*, 159 Wn. App. at 881. Where a term is defined in the policy, we interpret the term in accordance with that policy definition. *Polygon Nw. Co.*, 143 Wn. App. at 767. "Undefined terms in an insurance contract must be given their 'plain, ordinary, and popular' meaning." *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 877, 784 P.2d 507 (1990) (quoting *Farmers Ins. Co. of Wash. v. Miller*, 87 Wn.2d 70, 73, 549 P.2d 9 (1976)). This is because "[t]he language of insurance policies is to be interpreted in accordance with the way it would be understood by the average [person], rather than in a technical sense." *Dairyland Ins. Co. v. Ward*, 83 Wn.2d 353, 358, 517 P.2d 966 (1974).

■ ¶22 The Houston Casualty policy provides that the insurer shall pay on behalf of an insured person loss resulting from a claim made against the insured person "for

---

[3] Houston Casualty does not contest that Sauter is an "Insured Person" pursuant to the policy or that Commerce Bank's demand for payment constitutes a "Claim." The only issues disputed by the parties, both in the trial court and on appeal, are whether Sauter committed a "Wrongful Act" and whether he thereby suffered a "Loss."

a Wrongful Act." However, pursuant to the policy, an act by an "Insured Person" constitutes a "Wrongful Act" only when that person commits the act "while acting in [his or her] capacity as . . . such on behalf of the Insured Organization." The policy defines "Insured Person" as a "person who . . . is . . . a duly appointed or elected director, officer, general partner, manager, or equivalent executive of an Insured Organization." Thus, an "Insured Person" "act[s]" in [his or her] capacity as . . . such on behalf of the Insured Organization," as required in order to commit a "Wrongful Act," when that person commits the act in his or her official capacity as a "director, officer, general partner, manager, or equivalent executive" of the insured company.

¶23 Thus, no coverage is available pursuant to the Houston Casualty policy unless Sauter's purported loss resulted from a claim made against him for an act that he committed "while acting in [his] capacity as [CEO and manager] on behalf of" SJM. The common meaning of "capacity" is "legal qualification, competency, power, or fitness." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 330 (2002). "Behalf" means "in the interest of," "as the representative of," or "for the benefit of." WEBSTER'S, *supra*, at 198. Because the Houston Casualty policy requires both that the insured person performed the wrongful act in his or her official capacity and did so "on behalf of" the company, the plain meaning of the provision requires Sauter to have acted within his "legal qualification" as CEO and manager and "as a representative of" SJM.

■ ¶24 The facts, however, do not support such a conclusion. Rather, the facts demonstrate that Sauter was acting in his personal capacity when he executed the guaranty and thereafter defaulted on that guaranty. The guaranty itself makes obvious that Sauter was acting in his personal capacity in executing the guaranty. The agreement separately identifies the "Borrower" as "S-J MANAGEMENT, LLC" and the "Guarantor" as "MICHAEL J. SAUTER." Correspondingly, Sauter signed the guaranty as "Michael J.

Sauter." In contrast, he signed both the business loan agreement and the promissory note on behalf of SJM as "Michael J. Sauter, Manager of S-J Management, LLC." Moreover, the collateral securing the guaranty consists of seven deeds of trust for real property personally owned by the Sauters. Accordingly, the notices of default sent by Commerce Bank upon Sauter's failure to fulfill his obligations pursuant to the guaranty were sent to the Sauters, the owners of the encumbered properties.

¶25 Furthermore, the very nature of the guaranty indicates that Sauter was acting in his personal capacity in executing the guaranty. A "guaranty" "is 'a promise to answer for the debt, default, or miscarriage of another person.'" *Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.*, 134 Wn.2d 692, 707, 952 P.2d 590 (1998) (internal quotation marks omitted) (quoting *Robey v. Walton Lumber Co.*, 17 Wn.2d 242, 255, 135 P.2d 95 (1943)). "'A contract of guaranty, being a collateral engagement for the performance of an undertaking of another, imports the existence of two different obligations, one being that of the principal debtor and the other that of the guarantor.'" *Wilson Court Ltd.*, 134 Wn.2d at 707 (quoting *Robey*, 17 Wn.2d at 255). Thus, as a matter of law, "an entity cannot be a guarantor of its own obligations." *Wilson Court Ltd.*, 134 Wn.2d at 707 (declining to interpret a guaranty executed by corporate president such that the corporation would be the guarantor of its own contract, where the corporate president contended that he had executed the guaranty in his official capacity and, thus, could not be personally liable).

¶26 Had Sauter acted in his official capacity on behalf of SJM when he executed the guaranty—as he did when he signed the underlying business loan agreement—SJM would be both the debtor and the guarantor with regard to the Commerce Bank loan. Such cannot be the case. *See Wilson Court Ltd.*, 134 Wn.2d at 707. Were it so, the entire objective of the guaranty—to guarantee SJM's indebtedness to Commerce Bank in the event that SJM could not

pay the line of credit—would be undermined. Commerce Bank required the personal guaranty of Sauter as a condition for the loan agreement in order to secure SJM's indebtedness with property owned personally by Sauter. In the event that SJM became insolvent, Commerce Bank could then execute upon collateral *not owned by SJM*—but, rather, owned personally by Sauter—in order to collect the debt. Had Sauter executed the guaranty in his official capacity, only the property of SJM could have secured the debt, thus negating the purpose of the guaranty itself.

¶27 Nevertheless, Sauter contends that he executed the guaranty in his capacity as SJM's CEO and manager. This is so, he asserts, because he executed the guaranty "*because* he was SJM's CEO and Manager." As evidence that he was acting in such a capacity, Sauter notes that SJM's members unanimously agreed that he had executed the guaranty in his role as SJM's manager and, thus, that he was entitled to be indemnified by SJM for the personal liability that he incurred by virtue of the guaranty.[4] Sauter further asserts that the fact that the business loan agreement expressly required SJM to obtain a guaranty from Sauter demonstrates that Sauter was acting in his official capacity as CEO and manager when he executed that guaranty.

¶28 Thus, Sauter, in essence, contends that he was acting in his capacity as CEO and manager on behalf of SJM because he executed the guaranty in order to assist SJM in obtaining the line of credit. Although this was obviously his purpose in executing the guaranty, it does not follow that Sauter, in so doing, was acting "in his capacity" as CEO and manager "on behalf of" SJM. Rather, the facts clearly demonstrate that Sauter was acting in his personal capacity when he executed the guaranty and thereafter

---

[4] Sauter fails to demonstrate that this conclusion reached by SJM's members has any bearing on *our determination* of whether Sauter was acting in his official capacity on behalf of SJM in executing the guaranty.

failed to satisfy his obligation pursuant to that agreement.[5] The fact that Sauter is an officer of SJM is not dispositive of the question presented here—in what capacity did Sauter sign the guaranty and, thus, guarantee SJM's indebtedness to Commerce Bank?

¶29 Moreover, Sauter fails to recognize that, even had he been acting in his official capacity in executing the guaranty, no coverage would be available for his obligation to Commerce Bank for precisely that reason. Had Sauter signed the guaranty in his official capacity on behalf of SJM, the guaranty would bind SJM—not Sauter—and, thus, Sauter would not be personally liable for failure to satisfy any obligation pursuant to the guaranty. *See* 18B AM. JUR. 2D *Corporations* § 1587 (2004) (noting that "an officer of a corporation is not personally liable on its contracts if he or she does not purport to bind himself or herself individually"); *see also Inland-Ryerson Constr. Prods. Co. v. Brazier Constr. Co.*, 7 Wn. App. 558, 567, 500 P.2d 1015 (1972) (holding that, although a corporate officer is not presumed to be personally liable for corporate debts, the officer may expressly bind himself or herself to be answerable for such debts). Because Sauter could not thus incur personal liability, such liability could not be insured against by the Houston Casualty policy. As recently explained by the California Court of Appeals in analyzing a similar claim made by a corporate officer in that state, "In his capacity as an officer, he cannot be held liable for breach of a corporate contract. If he was acting in his individual capacity in breaching the contract, the D&O insurance did

---

[5] Sauter misconstrues Houston Casualty's argument regarding the existence of a "Wrongful Act," implying that Houston Casualty denied coverage for his "Claim" because Sauter had incurred personal liability. But Sauter confuses *personal liability* with actions taken in his *personal capacity*. The purpose of D&O insurance, as Sauter notes, is to protect directors and officers from personal liability. However, it protects directors and officers from such liability *when that liability is incurred due to acts committed in a director's or officer's capacity as such*. The fact that Sauter incurred *personal liability* is not the issue here. Rather, the relevant point is that Sauter was acting in his *personal capacity* when he incurred such liability—and that the policy does not provide coverage for acts performed in that capacity.

not cover any of his acts or omissions." *August Entm't, Inc. v. Phila. Indem. Ins. Co.*, 146 Cal. App. 4th 565, 582, 52 Cal. Rptr. 3d 908 (2007).

¶30 Because Sauter was not acting in his official capacity when he executed the guaranty, Sauter committed no "Wrongful Act" as defined by the Houston Casualty policy. Thus, the trial court correctly concluded that the policy does not provide coverage for Sauter's financial obligation to Commerce Bank.

## V

¶31 Sauter additionally contends that his obligation to Commerce Bank pursuant to the guaranty constitutes a "Loss" for which the Houston Casualty policy provides coverage. Conversely, Houston Casualty urges us to determine that the repayment of a loan does not constitute a "Loss" and that more generally, liability insurance is not intended to insure against such an obligation. Here, however, the policy language itself resolves the issue of coverage, as it requires that any "Loss," in order to be insured against, must result from a claim for a wrongful act. Because Sauter's obligation is the result of his promise to pay SJM's indebtedness—not the result of any "Wrongful Act"—the policy does not insure against his obligation.

¶32 Washington courts have not previously addressed whether a voluntary contractual obligation, such as an obligation to repay a loan, constitutes a "Loss" that may be insured against. However, courts in other states have. The California Court of Appeals, in determining whether a D&O liability policy provided coverage for a breach of contract claim, determined that

> the D&O policy did not cover the corporation's contractual debt or the officer's liability for breaching a contract. The breach of the contractual obligation asserted in this case did not give rise to a loss caused by a wrongful act within the meaning of the policy. Rather, the corporation was simply being required to pay an amount it voluntarily contracted to pay.

*August Entm't*, 146 Cal. App. 4th at 568-69. The court explained that a determination to the contrary "would expand the scope of the insurer's liability enormously and unpredictably without corresponding compensation." *August Entm't*, 146 Cal. App. 4th at 582. Moreover, the court noted that a determination that coverage existed for the insured's contractual obligations "would create a moral hazard problem, encouraging corporations to risk a breach of their contractual obligations, knowing that, in the event of a breach, the D&O insurer would ultimately be responsible for paying the debt." *August Entm't*, 146 Cal. App. 4th at 582. Such considerations apply with equal force here.

¶33 Nevertheless, we need not look beyond the explicit language of the Houston Casualty policy in order to determine that Sauter's purported "Loss" is not covered by that policy, regardless of whether his obligations pursuant to the guaranty constitute a "Loss" as defined therein. This is because the policy provides that Houston Casualty will pay only "Loss *resulting from* any Claim . . . for a Wrongful Act." (Emphasis added.) Thus, coverage cannot be available for Sauter's guaranty obligation if that obligation does not *result from* Commerce Bank's demand for payment on the guaranty.

¶34 Faced with similar facts, the Supreme Court of Nevada held that an insurance policy did not provide coverage for liability arising from a contractual obligation under a merger agreement because such liability did not constitute "a 'loss' that *resulted from* any 'wrongful act.' " *Am. Cas. Co. of Reading, Pa. v. Hotel & Rest. Emps. & Bartenders Int'l Union Welfare Fund*, 113 Nev. 764, 769, 942 P.2d 172 (1997). There, the International Welfare Fund (International Fund) entered into a merger agreement with the Southern Nevada Local Welfare Fund (Local Fund) wherein the International Fund agreed to indemnify the Local Fund for various losses and damages. *Am. Cas. Co. of Reading*, 113 Nev. at 766-67. The International Fund thereafter breached the indemnification agreement and settled

with the Local Fund for $750,000. *Am. Cas. Co. of Reading*, 113 Nev. at 767-68. The International Fund subsequently sued American Casualty, seeking a declaration that it was entitled under its insurance policy to indemnification for the settlement costs. *Am. Cas. Co. of Reading*, 113 Nev. at 768.

¶35 Noting that "loss" was defined very broadly in the policy "to include almost any amount awarded against the insureds," the court determined that the issue was not whether the damages constituted "loss" pursuant to the definition. *Am. Cas. Co. of Reading*, 113 Nev. at 769. Rather, the court determined, the issue was whether the judgment against the International Fund was "a 'loss' that *resulted from* any 'wrongful act'" of the insured. *Am. Cas. Co. of Reading*, 113 Nev. at 769. The court concluded that the only "wrongful act" committed by the International Fund was its failure to defend the Local Fund as contemplated by the merger agreement—and that any purported "loss" resulted not from that act but, rather, from the merger agreement itself:

> The international trustees were required to pay their contractual obligation. This contractual obligation did not result from their wrongful act of refusing to satisfy it. To hold otherwise would allow an insured to turn all of its legal liabilities into insured events by the intentional act of refusing to pay them. *The refusal to pay an obligation simply is not the cause of the obligation, and the international trustees' wrongful act in this case did not result in their obligation to pay; their contract imposed on them the obligation to pay.*

*Am. Cas. Co. of Reading*, 113 Nev. at 770 (emphasis added).

¶36 Similarly, here, any purported "Loss" suffered by Sauter did not result from a "Claim" made against Sauter for a "Wrongful Act." Rather, Sauter incurred the obligation to pay SJM's indebtedness by executing the guaranty—not by failing to satisfy his obligation pursuant thereto. In other words, his obligation to Commerce Bank was not the result of Commerce Bank's demand on the guaranty; instead, his

obligation was the result of the guaranty itself. Thus, regardless of whether Sauter's obligation constitutes a "Loss" as defined by the Houston Casualty policy, it is not a "Loss resulting from any Claim . . . for a Wrongful Act." Thus, the policy does not provide coverage for Sauter's obligation to Commerce Bank.

## VI

¶37 Sauter's contention that the Houston Casualty policy provides coverage for his guaranty obligation to Commerce Bank is unavailing for several reasons. First, Sauter executed the guaranty in his personal capacity, as demonstrated by the manner in which he signed the guaranty, the fact that the Sauters' personally owned properties secured the guaranty, and, perhaps most significantly, the principle that a corporation cannot be the guarantor of its own obligations. Second, even had Sauter executed the guaranty in his official capacity, such execution would bind SJM—not Sauter—and, thus, Sauter could not thereby incur personal liability. Finally, Sauter's obligation to Commerce Bank resulted from Sauter's execution of the guaranty, not from his failure to satisfy the consequent obligations. Thus, the trial court did not err by determining that the Houston Casualty policy does not provide coverage for Sauter's guaranty obligation.[6]

¶38 Affirmed.

Cox and Schindler, JJ., concur.

---

[6] Sauter requests an award of attorney fees on appeal pursuant to *Olympic Steamship Co. v. Centennial Insurance Co.*, 117 Wn.2d 37, 52-53, 811 P.2d 673 (1991), which provides for an award of such fees to an insured "in any legal action where the insurer compels the insured to assume the burden of legal action, to obtain the full benefit of his insurance contract." Because Sauter is not entitled to the insurance benefits that he sought in this lawsuit, his request for an award of fees must be denied.